# Judge Hellerstein

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Charles J. Gum, on Behalf of Himself and a Class of Persons Similarly Situated, | _____ civ. _____ |
| Plaintiff, | **COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT** |
| v. | |
| GLAXOSMITHKLINE plc, GLAXOSMITHKLINE RETIREMENT SAVINGS PLAN COMMITTEE, ANDREW WITTY, JEAN-PIERRE GARNIER, JULIAN HESLOP, MONCEF SLAOUI, CHRISTOPHER VIEHBACHER, CHRISTOPHER GENT, ROY ANDERSON, STEPHANIE BURNS, LAWRENCE CULP, CRISPIN DAVIS, DERYCK MAUGHAN, JAMES MURDOCH, DANIEL PODOLSKY, IAN PROSSER, RONALDO SCHMITZ, TOM DE SWAAN, ROBERT WILSON, MICHELLE KILLIAN, M. JUDITH LYNCH and DOES 1-30 | **CLASS ACTION** **JURY TRIAL DEMANDED** |
| Defendants. |  |

Plaintiff Charles J. Gum ("Plaintiff"), on behalf of himself and on behalf of a class consisting of similarly situated participants and beneficiaries (the "Participants") of the GlaxoSmithKline Retirement Savings Plan (the "GSK Plan") and the GSK Puerto Rico Retirement Savings Plan (the "Puerto Rico Plan") (the GSK Plan and the Puerto Rico Plan are hereinafter referred to collectively as the "Plans"), by his attorneys, alleges the following for his Complaint (the "Complaint"). The allegations contained herein are based on the investigation of counsel, except for those allegations pertaining to the Plaintiff, which are based on personal knowledge. Plaintiff may, after discovery and/or disclosure proceedings in this case, seek leave to amend this Complaint to add new parties or claims.

## NATURE OF ACTION

1.     Plaintiff, who was a Participant in at least one of the Plans during time periods relevant to this Complaint, brings this civil enforcement action under Section 502(a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a), for plan-wide relief on behalf of a class consisting of all current and former Participants in the Plans for whose individual accounts the Plans held shares of common stock of GlaxoSmithKline plc (hereinafter "GSK" or the "Company") (including in the form of units of the GSK Common Stock Fund) at any time from May 8, 2007 through August 19, 2010, inclusive (the "Class Period").  Plaintiff brings this action on behalf of the Plans and the Class pursuant to § 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2).

2.     As more fully set forth below, Defendants breached their fiduciary duties to the Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor Regulations, including 29 C.F.R. § 2550.  Defendants breached their fiduciary duties to the Participants in various ways, including, but not limited to, (i) misrepresenting and failing to disclose material facts to the Participants in connection with the administration of the Plan; (ii) failing to exercise their fiduciary duties to the Participants solely in the interests of the Participants for the exclusive purpose of providing benefits to Participants and their beneficiaries; (iii) failing to manage the Plans' assets with the care, skill, prudence or diligence of a prudent person under the circumstances; (iv) imprudently failing to diversify the investments in the Plans so as to minimize the risk of large losses; and (v) permitting the Participants to continue to elect to invest their retirement monies in GSK common stock when it was imprudent to do so, and when the Participants were not provided with timely, accurate and complete information concerning the Company as required by applicable law.  As a result of

2

these wrongful acts, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants are personally liable to make good to the Plans the losses resulting from each such breach of fiduciary duty.

## JURISDICTION AND VENUE

3.      Plaintiff's claims arise under and pursuant to ERISA § 502, 29 U.S.C. § 1132.

4.      This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

5.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because this is a District where the Plans were administered, where breaches of fiduciary duty took place, where a GSK subsidiary handling investor relations is based (at 499 Park Avenue, New York, N.Y. 10022), where GSK's ADRs trade and/or where one or more Defendants reside or may be found.

## THE PARTIES

6.      Plaintiff Charles J. Gum is a resident of the State of Michigan. Plaintiff Gum was employed by GSK (or a subsidiary or division of GSK) for several years until July 2010, and maintained an investment in GSK common stock in his individual account in the Plan during the Class Period.

7.      Defendant GSK is a developer and manufacturer of pharmaceuticals, including the drug Avandia (rosiglitazone) which was developed, manufactured and marketed as a treatment to control blood sugar in people with type 2 diabetes. GSK was formed as a result of the December 27, 2000 merger (the "Merger") of GlaxoWellcome plc ("Glaxo") and SmithKline Beecham plc ("SmithKline") (formed as a result of the 1988 merger of SmithKline Beckman Corporation and Beecham plc). GSK's ADRs trade in an efficient market on the New York

3

Stock Exchange ("NYSE") under the symbol "GSK." GSK's ordinary shares trade in an efficient market on the London Stock Exchange ("LSE").

8.　　　The GlaxoSmithKline Retirement Savings Plan Committee (the "Committee") was the named administrator of the Plans during the Class Period. The Committee and members of the Committee were fiduciaries of the Plans within the meaning of ERISA Section 3(21)(A) in that each member exercised discretionary authority with respect to the management, administration, and disposition of the Plans' assets. The Board of Directors of the Company, directly or acting through one of its committees, appointed the Committee and its members, and the Board was thus responsible for properly appointing, monitoring and informing the Committee and its members so that they could properly discharge their fiduciary obligations under ERISA.

9.　　　Does 1-30 were members of the Committee during all times relevant to this Complaint. As a member of the Committee, Does 1-30 were fiduciaries with respect to the Plans and exercised discretionary authority and/or control with respect to the management and administration of the Plans. Liability is asserted against Does 1-30 herein only to the extent, and while, the Does served as fiduciaries of the Plans.

10.　　　Defendant Andrew Witty ("Witty") joined GSK's Board of Directors (the "Board") in January 2008, and became the Company's Chief Executive Officer on May 21, 2008, having joined Glaxo in 1985. Witty was a member of the Board's Corporate Administration & Transactions Committee and Finance Committee. Defendant Witty was a fiduciary with respect to the Plans and exercised discretionary authority and/or control with respect to the management and administration of the Plans. At all times relevant to this Complaint Defendant Witty was a fiduciary with respect to the Plans and exercised oversight

4

responsibility and discretionary authority and/or control with respect to the management and administration of the Plans. Liability is asserted against Defendant Witty herein only to the extent, and while, he served as a fiduciary of the Plans.

11.     Defendant Jean-Pierre Garnier ("Garnier") became GSK's CEO and a member of the Board after the Merger. Defendant Garnier held those positions until his retirement on May 21, 2009. Defendant Garnier joined SmithKline in 1990, and was a member of its board of directors and Chief Operating Officer from 1996 through the date of the Merger. Garnier has a masters degree in pharmaceutical science and PhD in pharmacology. Defendant Garnier was a fiduciary with respect to the Plans and exercised discretionary authority and/or control with respect to the management and administration of the Plans. At all times relevant to this Complaint Defendant Garnier was a fiduciary with respect to the Plans and exercised oversight responsibility and discretionary authority and/or control with respect to the management and administration of the Plans. Liability is asserted against Defendant Garnier herein only to the extent, and while, he served as a fiduciary of the Plans.

12.     Defendant Julian Heslop ("Heslop") became GSK's Chief Financial Officer and a member of its Board on April 1, 2005, having joined Glaxo in 1998. Heslop is a member of the Board's Corporate Administration & Transactions Committee and Finance Committee. Defendant Heslop was a fiduciary with respect to the Plans and exercised discretionary authority and/or control with respect to the management and administration of the Plans. At all times relevant to this Complaint Defendant Heslop was a fiduciary with respect to the Plans and exercised oversight responsibility and discretionary authority and/or control with respect to the management and administration of the Plans. Liability is asserted against Defendant Heslop herein only to the extent, and while, he served as a fiduciary of the Plans.

13.     Defendant Moncef Slaoui ("Slaoui") became GSK's Chairman, Research & Development, and a member of its Board on May 17, 2006.  Mr. Slaoui holds a PhD in Molecular Biology and Immunology.  Slaoui was a member of the Board's Corporate Administration & Transactions Committee and Finance Committee.  Defendant Slaoui was a fiduciary with respect to the Plans and exercised discretionary authority and/or control with respect to the management and administration of the Plans. At all times relevant to this Complaint Defendant Slaoui was a fiduciary with respect to the Plans and exercised oversight responsibility and discretionary authority and/or control with respect to the management and administration of the Plans.  Liability is asserted against Defendant Slaoui herein only to the extent, and while, he served as a fiduciary of the Plans.

14.     Defendant Christopher Viehbacher ("Viehbacher") was a member of the Board from January 31, 2008 through September 8, 2008.  Mr. Viehbacher was also President, U.S. Pharmaceuticals from January 2003 through December 1, 2008, a division he joined in 1988. Defendant Viehbacher was a fiduciary with respect to the Plans and exercised discretionary authority and/or control with respect to the management and administration of the Plans. At all times relevant to this Complaint Defendant Viehbacher was a fiduciary with respect to the Plans and exercised oversight responsibility and discretionary authority and/or control with respect to the management and administration of the Plans.  Liability is asserted against Defendant Viehbacher herein only to the extent, and while, he served as a fiduciary of the Plans.

15.     Defendant Christopher Gent ("Gent") joined the Board as Deputy Chairman on June 1, 2004 and became Chairman of the Board on January 1, 2005.  Gent was a member of the Board's Corporate Administration & Transactions Committee, Finance Committee, and Remuneration Committee, and Chair of its Corporate Responsibility and Nominations

6

Committees.   Defendant Gent was a fiduciary with respect to the Plans and exercised discretionary authority and/or control with respect to the management and administration of the Plans. At all times relevant to this Complaint Defendant Gent was a fiduciary with respect to the Plans and exercised oversight responsibility and discretionary authority and/or control with respect to the management and administration of the Plans.   Liability is asserted against Defendant Gent herein only to the extent, and while, he served as a fiduciary of the Plans.

16.     Defendant Roy Anderson ("Anderson") joined the Board on October 1, 2007.  He previously held the position of Chief Scientific Adviser to the Ministry of Defense in the United Kingdom.  Anderson was a member of the Board's Audit Committee, Corporate Administration & Transactions Committee, and Finance Committee.  Defendant Anderson was a fiduciary with respect to the Plans and exercised discretionary authority and/or control with respect to the management and administration of the Plans. At all times relevant to this Complaint Defendant Anderson was a fiduciary with respect to the Plans and exercised oversight responsibility and discretionary authority and/or control with respect to the management and administration of the Plans.  Liability is asserted against Defendant Anderson herein only to the extent, and while, he served as a fiduciary of the Plans.

17.     Defendant Stephanie Burns ("Burns") joined the Board on February, 12, 2007. Ms. Burns holds a PhD in organic chemistry.  Burns was a member of the Board's Corporate Administration & Transactions Committee, Corporate Responsibility Committee, and Finance Committee.   Defendant Burns was a fiduciary with respect to the Plans and exercised discretionary authority and/or control with respect to the management and administration of the Plans. At all times relevant to this Complaint Defendant Burns was a fiduciary with respect to the Plans and exercised oversight responsibility and discretionary authority and/or control with

7

respect to the management and administration of the Plans.  Liability is asserted against Defendant Burns herein only to the extent, and while, she served as a fiduciary of the Plans.

18.     Defendant Lawrence Culp ("Culp") joined the Board on July 1, 2003. Culp was a member of the Board's Corporate Administration & Transactions Committee, Finance Committee, Nominations Committee, and Remuneration Committee.  Defendant Culp was a fiduciary with respect to the Plans and exercised discretionary authority and/or control with respect to the management and administration of the Plans. At all times relevant to this Complaint Defendant Culp was a fiduciary with respect to the Plans and exercised oversight responsibility and discretionary authority and/or control with respect to the management and administration of the Plans.  Liability is asserted against Defendant Culp herein only to the extent, and while, he served as a fiduciary of the Plans.

19.     Defendant Crispin Davis joined the Board on July 1, 2003. Davis was a member of the Board's Corporate Administration & Transactions Committee, Finance Committee, and Nominations Committee, and Chair of the Remuneration Committee.  Defendant Davis was a fiduciary with respect to the Plans and exercised discretionary authority and/or control with respect to the management and administration of the Plans. At all times relevant to this Complaint Defendant Davis was a fiduciary with respect to the Plans and exercised oversight responsibility and discretionary authority and/or control with respect to the management and administration of the Plans.  Liability is asserted against Defendant Davis herein only to the extent, and while, he served as a fiduciary of the Plans.

20.     Defendant Deryck Maughan ("Maughan") joined the Board on June 1, 2004. Maughan was a member of the Board's Audit Committee, Corporate Administration & Transactions Committee, Finance Committee, and Nominations Committee.     Defendant

8

Maughan was a fiduciary with respect to the Plans and exercised discretionary authority and/or control with respect to the management and administration of the Plans. At all times relevant to this Complaint Defendant Maughan was a fiduciary with respect to the Plans and exercised oversight responsibility and discretionary authority and/or control with respect to the management and administration of the Plans. Liability is asserted against Defendant Maughan herein only to the extent, and while, he served as a fiduciary of the Plans.

21.     Defendant James Murdoch ("Murdoch") joined the Board on May 20, 2009. Murdoch was a member of the Board's Corporate Administration & Transactions Committee, Finance Committee, Corporate Responsibility Committee, and Remuneration Committee. Defendant Murdoch was a fiduciary with respect to the Plans and exercised discretionary authority and/or control with respect to the management and administration of the Plans. At all times relevant to this Complaint Defendant Murdoch was a fiduciary with respect to the Plans and exercised oversight responsibility and discretionary authority and/or control with respect to the management and administration of the Plans. Liability is asserted against Defendant Murdoch herein only to the extent, and while, he served as a fiduciary of the Plans.

22.     Defendant Daniel Podolsky ("Podolsky") joined the Board on July 1, 2006. Podolsky was a member of the Board's Audit Committee, Corporate Administration & Transactions Committee, Corporate Responsibility Committee, and Finance Committee. He is a licensed medical doctor practicing with Massachusetts General Hospital and Harvard Medical School.     Defendant Podolsky was a fiduciary with respect to the Plans and exercised discretionary authority and/or control with respect to the management and administration of the Plans. At all times relevant to this Complaint Defendant Podolsky was a fiduciary with respect to the Plans and exercised oversight responsibility and discretionary authority and/or control with

9

respect to the management and administration of the Plans. Liability is asserted against Defendant Podolsky herein only to the extent, and while, he served as a fiduciary of the Plans.

23.     Defendant Ian Prosser ("Prosser") joined the SmithKline Board of Directors on May 23, 2000, and became a member of the GSK Board after the Merger. Mr. Prosser retired from the Board on May 20, 2009. Defendant Prosser was a fiduciary with respect to the Plans and exercised discretionary authority and/or control with respect to the management and administration of the Plans. At all times relevant to this Complaint Defendant Prosser was a fiduciary with respect to the Plans and exercised oversight responsibility and discretionary authority and/or control with respect to the management and administration of the Plans. Liability is asserted against Defendant Prosser herein only to the extent, and while, he served as a fiduciary of the Plans.

24.     Defendant Ronaldo Schmitz ("Schmitz") joined the Glaxo board of directors on January 23, 2000, and became a member of the GSK Board after the Merger. Mr. Schmitz retired from the Board on May 20, 2009. Defendant Schmitz was a fiduciary with respect to the Plans and exercised discretionary authority and/or control with respect to the management and administration of the Plans. At all times relevant to this Complaint Defendant Schmitz was a fiduciary with respect to the Plans and exercised oversight responsibility and discretionary authority and/or control with respect to the management and administration of the Plans. Liability is asserted against Defendant Schmitz herein only to the extent, and while, he served as a fiduciary of the Plans.

25.     Defendant Tom de Swaan ("Swaan") became a member of the Board on January 1, 2006, and was the Chairman of the Company's Audit Committee. Swaan was also a member of the Board's Corporate Administration & Transactions Committee, Finance Committee,

10

Corporate Responsibility Committee, and Remuneration Committee. Defendant Swaan was a fiduciary with respect to the Plans and exercised discretionary authority and/or control with respect to the management and administration of the Plans. At all times relevant to this Complaint Defendant Swaan was a fiduciary with respect to the Plans and exercised oversight responsibility and discretionary authority and/or control with respect to the management and administration of the Plans. Liability is asserted against Defendant Swaan herein only to the extent, and while, he served as a fiduciary of the Plans.

26.     Defendant Robert Wilson became a member of the Board on November 2, 2003. Wilson was a member of the Board's Audit Committee, Corporate Administration & Transactions Committee, Finance Committee, and Nominations Committee. Defendant Wilson was a fiduciary with respect to the Plans and exercised discretionary authority and/or control with respect to the management and administration of the Plans. At all times relevant to this Complaint Defendant Wilson was a fiduciary with respect to the Plans and exercised oversight responsibility and discretionary authority and/or control with respect to the management and administration of the Plans. Liability is asserted against Defendant Wilson herein only to the extent, and while, he served as a fiduciary of the Plans.

27.     Defendant Michelle Killian ("Killian") is, and at times herein relevant was, GSK's Vice President, U.S. Benefits. On June 27, 2007, Ms. Killian signed, on behalf of the GSK Plan, the GSK Plan's 11-K Annual Report, filed with the SEC, for the GSK Plan's year ended December 31, 2006 (the "GSK Plan 2006 11-K"). On June 23, 2008, Ms. Killian signed, on behalf of the Puerto Rico Plan, the Puerto Rico Plan's 11-K Annual Report, filed with the SEC, for the Puerto Rico Plan's year ended December 31, 2007 (the "Puerto Rico Plan 2007 11-K"). Defendant Killian also signed, as plan administrator and employer/plan sponsor/DFE, the

11

Company's Annual Return/Report of Employee Benefit Plan ("Return/Report") filed with the Department of Labor ("DOL") on Form 5500 for the year ended December 31, 2007 ("2007 Form 5500") and Return/Report filed with the DOL on Form 5500 for the year ended December 31, 2008 ("2008 Form 5500"). Defendant Killian was a fiduciary with respect to the Plans and exercised discretionary authority and/or control with respect to the management and administration of the Plans. At all times relevant to this Complaint Defendant Killian was a fiduciary with respect to the Plans and exercised oversight responsibility and discretionary authority and/or control with respect to the management and administration of the Plans. Liability is asserted against Defendant Killian herein only to the extent, and while, she served as a fiduciary of the Plans.

28.     Defendant M. Judith Lynch ("Lynch") at times herein relevant was GSK's Senior Vice President Benefits. On June 27, 2008, Ms. Lynch signed, on behalf of the Puerto Rico Plan, the Puerto Rico Plan 2007 11-K. Defendant Lynch was a fiduciary with respect to the Plans and exercised discretionary authority and/or control with respect to the management and administration of the Plans. At all times relevant to this Complaint Defendant Lynch was a fiduciary with respect to the Plans and exercised oversight responsibility and discretionary authority and/or control with respect to the management and administration of the Plans. Liability is asserted against Defendant Lynch herein only to the extent, and while, she served as a fiduciary of the Plans.

29.     Defendants Witty, Garnier, Heslop, Slaoui, Viehbacher, Gent, Anderson, Burns, Culp, Davis, Maughan, Murdoch, Podolsky, Prosser, Schmitz, Swaan, and Wilson are collectively hereinafter referred to as the "Director Defendants."

12

30.     Defendants Does 1-30, Killian, Lynch and the Director Defendants are collectively hereinafter referred to as the "Individual Defendants."

31.     All of the Individual Defendants were *de facto* fiduciaries of the Plans as a result of their discretionary authority or control over the Plans under the very broad definition of "fiduciary" set forth in ERISA at § 3(21)(A), 29 U.S.C. § 1002(21)(A). A person or entity is a fiduciary even if the Plans do not name him as such or by its terms assign fiduciary duties to him where, by his conduct, he engages in fiduciary activities. Those who have discretion over management of the Plans or the Plans' assets are fiduciaries regardless of the labels or duties assigned to them by the language of the Plans. Moreover, in order to fulfill the express remedial purpose of ERISA, the definition of "fiduciary" is construed broadly.

32.     The breaches of fiduciary duty committed by Individual Defendants as alleged herein were committed by the Individual Defendants in the course of their employment by the Company (in the case of Defendants Does 1-30, Witty, Garnier, Heslop, Slaoui, Viehbacher Killian and Lynch) and in the course of their compensated affiliation with and service to the Company and the Plans (in the case of the Director Defendants). Accordingly, GSK is liable, under the doctrine of *respondeat superior*, for the breaches of fiduciary duty alleged herein.

## CLASS ACTION ALLEGATIONS

33.     Plaintiff brings this action on his own behalf and as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class consisting of all current and former Participants in the Plans for whose individual accounts the Plans held shares of GSK stock (including in the form of units of the GSK Common Stock Fund) at any time from May 8, 2007 through August 19, 2010 (the "Class").

34.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are, at minimum, thousands of members of the Class.  According to the 2007 Form 5500, there were 33,292 participants in the GSK Plan as of December 31, 2007.  According to the 2008 Form 5500, there were 31,587 participants in the GSK Plan as of December 31, 2008.

35.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

        a.     Whether Defendants were fiduciaries;

        b.     Whether Defendants breached their fiduciary duties;

        c.     Whether the Plans and the Participants were injured by such breaches; and

        d.     Whether the Class is entitled to damages and injunctive relief.

36.     Plaintiff's claims are typical of the claims of the other members of the Class, as the Plaintiff and all members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

37.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained able counsel with extensive experience in class action ERISA litigation. The interests of Plaintiff are coincident with and not antagonistic to the interests of the other class members.

38.     Prosecution of separate actions by members of the class would create a risk of inconsistent adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual

members of the class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

39.    Questions of law and questions of fact which are common to the members of the class will predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this Complaint, taking into account:

a.    the interest of members of the class in individually controlling the prosecution or defense of separate actions;

b.    the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

c.    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

d.    the difficulties likely to be encountered in the management of a class action.

40.    Moreover, because the damages suffered by many of the Participants will be relatively small, the expense and burden of individually litigating their rights would make it impossible to individually redress the wrongs alleged herein.

41.    The claims herein are under ERISA and related principles of federal common law cannot be asserted by the plaintiffs in derivative actions against the company or in class actions under securities law.

## DESCRIPTION OF THE PLAN

42.    At all times relevant to this Complaint, the Plans were employee benefit plans

15

within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

43. According to both the GSK Plan's 2006 11-K Annual Report and the Puerto Rico Plan's 2007 11-K Annual Report:

> The Plan was established to encourage and assist Company employees to save regularly for retirement. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).

This statement was reiterated in the GSK Plan's Financial Statements as of the years ended December 31, 2009 and 2008 and Supplemental Schedule as of December 31, 2009 (the "GSK Plan 2008/2009 Statements"), submitted to the SEC on or about June 15, 2010.

44. At all times relevant to this Complaint, the Plans were "defined contribution" or "individual account" plans within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plans provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which could be allocated to such Participant's accounts. In fact, both the GSK Plan 2006 11-K and Puerto Rico Plan 2007 11-K specifically state that the Plans are defined contribution plans.

45. At all times relevant to this Complaint, the Plans provided a number of different options for investment of the Plans' assets, including GSK common stock through the GSK Common Stock Fund (the "Fund"). Hundreds of millions of dollars of the Plan's assets were invested in the Fund during the Class Period, and the Plans suffered significant losses as a result thereof.

46. At all times relevant to this Complaint, Participants directed the Plans to purchase investments from among the investment options available under the Plans and allocated them to their individual accounts.

16

47.     According to the GSK Plan 2006 11-K, "[t]he GlaxoSmithKline Stock Fund invests in American Depository Shares ("ADSs") each of which represents two ordinary shares of GlaxoSmithKline Plc."

48.     According to the GSK Plan 2006 11-K, "eligible employees with one hour of credited service may voluntarily elect to contribute pre-tax contributions ranging from 1% to 50% of the eligible compensation." Further, the "Company contributes matching contributions to participating employees with one year of service in an amount equal to the employee's pre-tax contribution not in excess of 4% of the employee's eligible compensation."

49.     According to the Puerto Rico Plan 2007 11-K, "participants may contribute up to 10% of after-tax annual compensation." Further, the "Company contributes matching contributions to participating employees with one year of service in an amount equal to 100% of the employee's pre-tax contribution not in excess of 4% of the employee's eligible compensation."

50.     According to the GSK Plan 2006 11-K, as of December 31, 2006 the GSK Plan held $901,453,350 in GSK stock, and as of December 31, 2005 the GSK Plan held $919,001,626 in GSK stock. According to the GSK Plan 2008/2009 Statements, as of December 31, 2008 the GSK Plan held $550,537,718 in GSK stock, and as of December 31, 2009 the GSK Plan held $633,738,509 in GSK stock.

51.     According to the Puerto Rico Plan 2007 11-K, as of December 31, 2006 the Puerto Rico Plan held $19,407,709 in GSK stock. As of December 31, 2006, the GSK Plan held $21,879,888 in GSK stock.

52.     A GSK Plan Participant communication discussing the Fund, which was released on or about June 30, 2010, reported that the Fund had significantly underperformed its

benchmark, the S&P 500 Index, in 2010 through June 30, 2010 and for the one year period ended

June 30, 2010. The communication included a graph showing:



53.    Consistent with and further to the June 30, 2010 Plan communication, the value of

GSK stock has declined precipitously (approximately 36%) during the Class Period.

## ADMINISTRATION OF THE PLAN

54.    Defendants, as fiduciaries of the Plan, were required by ERISA to furnish certain

information to Participants. For example, ERISA Section 101, 29 U.S.C. § 1021, requires the

Plans' Administrator to furnish Summary Plan Descriptions ("SPD") to Participants. ERISA

Section 102, 29 U.S.C. § 1022, provides that an SPD must apprise Participants of their rights and

obligations under the Plans.

55.     At all times relevant to this Complaint, Defendants had the discretion to establish and change the investment alternatives among which Participants could direct the investment of the Plans' assets allocated to their accounts.

56.     At all times relevant to this Complaint, Defendants had a duty to review the Plans' investment policies and the selection and the performance of investment alternatives offered under the Plans.  There was no requirement that any assets of the Plans be invested in Company stock or that Company stock be continued as an investment alternative.

57.     At all times relevant to this Complaint, Defendants had a duty to obtain from the Company information necessary for the proper administration of the Plans.

58.     At all times relevant to this Complaint, Defendants were fiduciaries of the Plans as defined by ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority or control respecting management of the Plans or exercised discretionary authority or control respecting management or disposition of assets and had discretionary authority or responsibility in the administration of the Plans.

59.     Each Defendant is liable for the breaches of fiduciary duty of the other Defendants under ERISA § 405, 29 U.S.C. § 1105.

## BREACHES OF FIDUCIARY DUTY

60.     As required by ERISA, Defendants issued one or more SPDs, each of which either referred to or incorporated by reference the documents filed by GSK with the SEC under the federal securities laws.    These filings, however, contained numerous material misrepresentations and omitted to state material facts which were necessary to make the statements which were made not misleading.

19

61.    GSK's SEC filings during the Class Period, as incorporated into the SPDs, negligently omitted to disclose to the Participants important information concerning the Company's business, operations, regulatory compliance and prospects.  Among other things, the SEC filings and SPDs failed to disclose that Avandia, GSK's popular diabetes drug caused an increase risks of heart attacks and strokes in patients taking the drug, as in outlined in the Nissen Study (defined *infra*).

62.    Defendants were not obligated by ERISA or by the Plans to discharge their duty to provide information to Participants through the mechanism of incorporation of SEC filings. Defendants could have fulfilled this duty by setting forth sufficient and accurate information in the SPDs themselves, and updating such information as appropriate.    Defendants chose, however, to adopt the mechanism of incorporation of SEC filings into the SPDs, and the SEC filings contained materially false and misleading information which caused loss to the Plans and the Participants as set forth above.

63.    At all relevant times, Defendants should have known of the material misrepresentations and omissions, including those filed with the SEC and incorporated by reference in the SPDs.

## FACTS CONCERNING AVANDIA

64.    The FDA first approved Avandia in May 1999.

65.    In April 2002, Avandia's label received new warnings about an increase of heart failure.

66.    In August of 2006, GSK submitted pooled analysis of 42 controlled clinical trials to the FDA.  Later, in February of 2007, GSK sent out a letter to doctors stating that a clinical trial found a "significantly" higher risk of bone fracture in woman who used Avadia rather than

those who received two older diabetes medications.

67.     In May of 2007, The New England Journal of Medicine (the "NEJM") published,
in an article entitled the "Effect of Rosiglitazone on the Risk of Myocardial Infarction and Death
from Cardiovascular Causes" by Steven E. Nissen, M.D. and Kathy Wolski, M.P.H., a pooled
analysis of the 42 studies which raises the possibility to that Avandia increases users' heart
attack risk the "Nissen Study"). The FDA subsequently issues a "safety alert" for the drug.
However, prior to the publishing of the article, as outlined in the Senate Report, defined *infra*,
GSK managed to get a copy from one of its consultants, and despite the fact that the Company's
head of research and Defendant herein, Moncef Slaoui, agreed with the conclusions of the Nissen
Study, Defendants began a systematic attack of the Nissen Study alleging it was unsound.
Further, as outlined in the Senate Report, Defendants began to intimidate scientist and suppress
information to protect the Company's Avandia sales.

68.     It was later revealed (in August of 2010) by Time Magazine that:

Five days before a 2007 article in the New England Journal of Medicine showed
that the diabetes drug Avandia was linked to a 43% increase in heart attacks
compared with other medications or placebos, a group of scientists and executives
from the drug's maker, GlaxoSmithKline (GSK), gathered in a conference room
at the offices of the Food and Drug Administration in White Oak, Md. The GSK
goal: to convince regulators that the evidence that the company's $3 billion-a-year
blockbuster drug caused heart problems was inconclusive. To do that, the GSK
officials focused not on heart-attack data but on a broader, less well defined
category of heart problems called myocardial ischemia. The most recent studies of
Avandia, the GSK officials told the FDA, had "yielded information that is
inconsistent with an increased risk of myocardial ischemic events," according to
sealed court proceedings obtained by TIME.

What GSK didn't tell the FDA was that on May 14, 2007, two days before the
White Oak meeting, GSK's Global Safety Board had noted that a new assessment
of Avandia studies "strengthens the [cardiac-risk] signal observed in the
[previous] analysis." Or that eight days earlier, the company's head of research
and development, Moncef Slaoui, had sent an e-mail to its chief medical officer
saying Avandia patients showed an "increased risk of ischemic event ranging
from 30% to 43%!" Or that the day before the meeting, the company had

produced a preliminary draft report that showed patients on Avandia had a 46% greater likelihood of heart attack than those in a control group.

But the mixed-evidence argument GSK presented to the FDA worked. After months of deliberation, the agency decided to keep the drug on the market — a move worth billions of dollars to GSK but that also may have put millions of patients at risk.

69.     According to IMS Health, which provides market information to the drug and health care industries, approximately 5.6 million Avandia prescriptions were dispensed within the United States. Further, according to a July 21, 2010, Reuters report, in 2006 prior to the 2007 study linking Avandia to a higher risk of heart attacks, the drug was GSK's "second-biggest drug at $3 billion a year."

70.     On July 3, 2007, an FDA advisory committee voted 20-3 that Avandia increased heart attack risks for its users, but voted 22-1 that its overall risk/benefit ratio warranted keeping the drug on the market. According to a July 19, 2010 article in USA Today, during that panel the FDA did not give panelists the option to vote to remove the drug from the market.

71.     On October 2, 2007, the FDA office which monitors drugs on the market recommended withdrawing Avandia, but the FDA office which reviews drugs before they are approved allowed Avandia to stay on the market. However, on November 14, 2007, the FDA added a "black box" warning to the labels of Avandia, and the two drugs which combine Avandia with another diabetes medication, Avandaryl and Avandamet, with information contained in the analysis published by The New England Journal of Medicine. The new warning labels also included three studies which the FDA stated "have not confirmed or excluded" whether the drug increases its users' risk for heart attack , stating that available data is "inconclusive."

72.     However, according to the United States Senate Committee on Finance (the "Finance Committee") this brief history recited *supra* is not the complete history of Avandia as

known to GSK. In fact, on February 20, 2010, the Finance Committee issued a press release entitled "Baucus, Grassley Release Finance Committee Report on Diabetes Drug Avandia, Express Concern About FDA's Role in Protecting Patients in Ongoing Avandia Study" (the "Finance Committee Press Release") announcing the Committee's January 2010 Staff Report on GlaxoSmithKline and the Diabetes Drug Avandia (the "Senate Report"). According to the press release, the Senate Report was the result of Finance Committee investigators reviewing more that 250,000 pages of documents provided by GSK, the FDA, and several research institutes. This Finance Committee Press Release also followed Senators Baucus and Grassley's February 18, 2010, to FDA Commissioner Margaret A. Hamburg, MD (the "Baucus/Grassley Letter"), wherein they stated that:

> The totality of evidence suggests that GSK was aware of the possible cardiac risks associated with Avandia years before such evidence became public.... Based on this knowledge, GSK had a duty to sufficiently warn patients and the FDA of its concerns in a timely manner. Instead, GSK executives intimidated independent physicians, focused on strategies to minimize findings that Avandia may increase cardiovascular risk, and sought ways to downplay findings that rival drug ACTOS (pioglitazone) might reduce cardiovascular risk.

73. The Senate Report also provided this chronology of related Avandia events:

## APPENDIX II: TIMELINE

2004—A slide appears to show that the RECORD trial is statistically inadequate to answer questions on cardiovascular safety. The slide show also points out that GSK is creating studies to counter Takeda's PROactive study on ACTOS, a competitor to Avandia.

2004—GSK experts advise the company as to the possible biological mechanisms behind the cardiovascular risk associated with Avandia.

September 2004— GSK commissions an observational study to examine over 11,000 subjects for an "initial" analysis of linkages between Avandia and myocardial ischemia.

June 3, 2004—GSK's clinical manager reports on feedback from a consultant who expressed concern over the cardiovascular risks of Avandia. The

consultant says that he does not intend to discontinue Avandia use in patients, but will push it to a backup position behind similar, rival drugs.

December 2, 2004—Internal GSK document highlights the inadequacy of the RECORD trial, in particular its "low event rates."

June 2005—A briefing document on GSK's cardiovascular plan for Avandia notes several "important limitations of RECORD" including the study release date and the low event rate.

July 18, 2005—GSK holds a meeting to discuss the need for a study to compete with PROactive, in particular to address the "European commercial need" for a study.

Fall 2005—GSK presents the initial observational trial of Avandia, showing that the hazard ratio was 1.29, meaning that Avandia increased the risk of heart-related ischemia by 29 percent. An "updated" observational study is commissioned.

Late 2005—GSK drafts a retrospective analysis discussing the underlying cause for the increase in ischemia due to Avandia.

Early 2006—GSK experts discuss problems with the DREAM study.

Summer 2006—The results of the GSK "updated" trial were presented, showing that the hazard ratio of these results was 1.31, meaning that Avandia increases the risk of myocardial ischemia by 31 percent.

May 2, 2007—Dr. Steven Nissen submits his meta-analysis on Avandia to the New England Journal of Medicine (NEJM) for peer review and publication.

May 3, 2007—Dr. Steve Haffner, an NEJM peer reviewer and consultant for GSK, leaks Nissen's study draft on Avandia to GSK.

May 8, 2007—Moncef Slaoui, head of research for GSK, writes an email to several executives agreeing with the conclusions found in the Nissen article.

May 9, 2007—GSK begins drafting "key messages" to combat the Nissen study.

May 9, 2007—Sir Colin Dollery, a senior GSK advisor, acknowledges the accuracy of Nissen's analysis and suggests that the company concentrate on "effective risk management."

May 21, 2007—NEJM publishes Dr. Nissen's meta-analysis and on the same day GSK responds with a statement of disagreement.

May 23, 2007—A GSK official emails members of the RECORD steering
committee requesting a meeting to discuss the publication of the study's
interim results. Emails show that GSK executives were intent on
publishing the interim results regardless of whatever opinion the steering
committee voiced.

May 29, 2007—RECORD interim results were submitted to NEJM for peer
review and publication.

June 1, 2007—The RECORD authors received a reply from NEJM regarding their
first draft which included a summary of the highly critical comments made
by the panel of 8 experts.

June 6, 2007—Dr. Moncef Slaoui testifies in a congressional hearing on Avandia
and FDA regulation. He states, "I will say that we found the RECORD
data which we published yesterday in the New England Journal of
Medicine very reassuring, recognizing that it is interim and therefore not
fully conclusive." That same day GSK dismisses the idea that the
RECORD results had been published in response to Dr. Nissen's study.

74.     According to the Senate Report, the Finance Committee staff began its

investigation in May 2007 after the NEJM published the Nissen Study. During its investigation,

the Committee staff determined that evidence demonstrated that GSK knew or should have

known, for several years prior to the NEJM article, that there were possible cardiac risks

associate with Avandia, and that despite the fact that at least one Company insider and Defendant

herein agreed with the findings of the Study, the Company chose to not disclose any information

regarding Avandia's cardiac risks.

75.     Instead, according to the Senate Report:

When an independent scientist [Nissen] sought to publish a study in 2007 pointing
out the cardiovascular risk of Avandia, GSK acquired a leaked copy of that stuffy
from one of its consultants prior to the study being published. The company's
own experts analyzed the study, found it to be statistically reliable, and then
attacked the soundness of that study in press releases and public comments. GSK
also sought to counter the study's findings by quickly releasing preliminary
results from its own study on Avandia, even though the company's internal
communications established its study was no primarily designed to answer
questions about cardiovascular risk.

76.     There appears a questionable relationship between GSK and the FDA with regards to the approval of Avandia, and a perhaps a conflict interest within the FDA. According to a July 12, 2007 USA Today article entitled "FDA scientist says she was reprimanded for warning," when Rosemary Johann-Liang, former deputy director of the FDA's Division of Drug Risk Evaluation, took her staff's advice to recommend that Avandia get the "black box" warning about congestive heart failure, she was also "verbally reprimanded and told to talk to her director before making any major recommendations related to drug safety." While the title or the article states that Dr. Johann-Liang claimed she was reprimanded for the warning, the body of the article actually states that "FDA staffers told Senate Finance Committee investigators" about the reprimand. Accordingly, after D. Johann-Liang voluntarily left the FDA for another job, she stated that "she might have tried to figure out how to stay at the FDA "if the agency had a vision of promoting and protecting public health."

77.     The Finance Committee, as enunciated by Senator Grassley, expressed concerns about an FDA office that reviews a drugs it has already approved for market sales, finding that such office has "a natural interest that [original] decision" to place the drug on the market. *See* Finance Committee Press Release.

78.     According to Senator Baucus in the Senate Finance Committee Press Release, "Americans have a right to know there are serious health risks associated with Avandia and [GSK] had a responsibility to tell them." Similarly, Plan Participants had a right to have the Company only allow Plan investment in GSK stock if the stock was prudent, however, because of the unknown serious health risks associated with Avandia, the stock was not prudent.

79.     Between July 13 and 14, 2010, an FDA advisory committee met to review Avandia and its risk for heart attack for users. The vote was 12-10-3, with 12 panelists voting to

pull Avandia from the market and 10 panelists voting to keep the drug on the market while greatly restricting its use.  Only 3 panelists voted for the drug to remain on the market as it was. According to a July 19, 2010 article in USA Today, entitled "Doctors say it's already over for diabetes drug Avandia," Clifford Rosen, a senior endocrinologist with the Maine Medical Center Research Institute and one of the 10 FDA advisory panel members who voted to keep Avandia on the market, stated he would actually prefer if the FDA withdrew the drug.  According to the article, Rosen further stated that he believed "the drug is done.  Nobody should be prescribing it . . . . Anybody who went to or heard this meeting would never prescribe [Avandia] under any circumstances."  Rosen previously chaired the 2007 FDA advisory committee, and stated in the article that he has not prescribed the drug since that meeting.

80.     Further, a July 23, 2010 report by the Wall Street Journal stated that the FDA had asked the Department of Health and Human Services to investigate whether one of the July 2010 FDA advisory panelists had a conflict of interest.  Allegedly, David Capuzzi, an endocrinologist in Philadelphia, had received $14,000 from the Company for speaking on behalf of another GSK drug, despite the fact that Mr. Capuzzi had previously informed the FDA that he had no connection with the Company, and the FDA claimed to have vetted all of its July 2010 advisory panelists for conflicts.

81.     In addition, on July 13, 2010, Bloomberg reported that GSK had agreed to pay approximately $460 million to settle the majority of lawsuits alleging that Avandia can cause heart attacks and strokes, more particularly, approximately $46,000 each for about 10,000 separate lawsuits.  At the time of the announcement, the FDA advisory panel had not yet released its recommendations regarding the drug.

82.    On July 15, 2010, the Company announced that it expected to record a legal charge for the second quarter of 2010 of $2.36 billion. According to the related press release entitled "GlaxoSmithKline legal update," at least part of those charges related to "provisioning" for settled Avandia related lawsuits "and an estimate for those cases [the Company has] received and are still outstanding." The Company specifically concealed how the charges would be distributed between, *inter alia*, the three principal drugs at issue – Avandia, Cidra, and Paxil.

83.    Moreover, according to the Company's July 21, 2010 press release entitled "Q2 ESP before major restructuring* 2.6p (29.3p excluding pre-announced legal charge)," there was a 1.9 billion decline in US sales partially attributable to lower Avandia sales. According to a Reuters report that same date, "earnings slumped 92 percent" during that quarter.

84.    In addition, on that same day U.S. health officials "halted enrollment of new patients in a clinical trial of . . . Avandia while regulators consider if the drug should stay on the market," according to a Reuters report. As stated in the Baucus/Grassley Letter, in 2007 the FDA originally asked GSK to perform the cardiovascular safety trial entitled TIDA (Thiazolidinedione Intervention With Vitamin D Evaluation) to compare Avandia to other diabetes treatments such as its chief competitor ACTOS. According to a May 20, 2010 Reuters report citing The Wall Street Journal, medical facilities were having difficulties recruiting patients for the study. In fact, according to William Applegate, Dean of Wake Forest University Baptist Medical Center, the Medical Center was "not succeeding in recruiting anybody."

85.    According to that same Reuters release, Sidney M. Wolf, the head of Public Citizen's Health Research Group, and became a member of the FDA's Drug Safety and Risk Management Committee in 2009, claims that "the FDA was 'failing to protect the public' by

letting current patients stay in the study." According to GSK spokeswoman Mary Anne Rhyne, more than 1,300 patients of a plan 16,000 were enrolled as of mid-July.

86.     On July 21, 2010, the FDA ordered GSK to discontinue new patient enrollment for the post-marketing TIDE trial of Avandia, and to update investigators, institutional review boards (IRBs) and ethics committees involved in the TIDE trial regarding the new safety information presented at the joint FDA Advisory Committee meetings held on July 13-14.

87.     In August of 2010, *Cardiology News* reported that Avandia *"accounted for 1,354 patient deaths in 2009, more than any other prescription drug*, according to a June report from the Institute for Safe Medication Practices. However, the institute blamed publicity about the drug's cardiovascular risks in part for the large number of fatalities reported to the Food and Drug Administration . . . . 'The manufacturer, GlaxoSmithKline, told us earlier that it believed many of the adverse drug event reports for rosiglitazone were associated with possible lawsuits against the company,' the report said. The institute excluded reports it knew involved legal claims but said it couldn't rule out the bad publicity as the reason for some other reports of cardiovascular events and deaths associated with rosiglitazone." (emphasis added).

88.     Also, around August 3, 2010, a new study to a study to be published in the October issue of the Journal of Clinical Endocrinology & Metabolism suggested that Avandia increased the risk for fractures in postmenopausal women and in men taking both loop diuretics and thiazolidinediones.

89.     In response to Time Magazine's article that GSK withheld information from the FDA (discussed above) the FDA commenced an investigation as to whether GSK broke the law by failing to fully inform the agency about the heart risks associated with Avandia.

Additionally, FDA regulators questioned the letter that the Company was required to send regarding the TIDE trial raised additional controversy.  According to an article entitled "Glaxo Account of Hearing Questioned" published by The New York Times on August 20, 2010:

> [A] federal official and some members of the panel now say the company's letter is misleading and could endanger patients. The dispute is occurring just weeks before the Food and Drug Administration is expected to announce whether Avandia's label must include new warnings, whether sales of the drug will be restricted or whether Avandia must be withdrawn from the market.
>
> Doctors who received the letter, dated July 28, are investigators in a study called the Tide trial, which was intended to compare the heart risks of Avandia with those of Actos, a similar drug made by Takeda Pharmaceuticals.
>
> Results of the trial, which was requested by the F.D.A., are not expected for years. The ethics of the Tide trial were a point of contention at the advisory committee hearing, and the F.D.A. ordered GlaxoSmithKline to stop recruiting new patients into the trial, although current patients could continue.
>
> Dr. David Graham, an F.D.A. medical officer, made an impassioned presentation at the advisory hearing arguing that the study should be stopped because thousands of patients in the trial were being exploited. None of these arguments were mentioned in GlaxoSmithKline's letter.
>
> "This summary is biased, misleading and not truthful," Dr. Graham said in an interview. "The whole purpose of this letter is so that they can reassess whether this is an ethical trial going forward, but the step-by-step ethical flaws and problems with the Tide trial are not even referenced."
>
> Several members of the advisory committee complained that the company's letter was biased.
>
> "This letter is really deceptive," said Dr. Clifford J. Rosen, a panel member. He added that the letter also did not refer to a presentation at the hearing by members of an Institute of Medicine study panel that said observational studies could be useful.
>
> Dr. Curt D. Furberg, also a panel member, described the letter as a "very Avandia friendly" document that ignored much of the discussion criticizing the validity of GlaxoSmithKline's studies. Other panel members expressed similar reservations.
>
> But another panel member, Dr. Sanjay Kaul, disagreed, saying the letter "faithfully reflects the deliberations of the Avandia advisory meeting."
>
> Erica Jefferson, an F.D.A. spokeswoman, said that after ordering GlaxoSmithKline to send a summary of the hearing to the Tide trial investigators,

the agency had relied on the company to provide a balanced account. "F.D.A. did not preclear or approve the content," she said.

Mary Anne Rhyne, a GlaxoSmithKline spokeswoman, said the company had only one week to write the 10-page summary, which was necessarily brief. But the company and the leader of the Tide trial agreed that the letter "reflected the science and data discussed at the advisory committee meeting," Ms. Rhyne said.

Dr. Steven Nissen, a Cleveland Clinic cardiologist who made a presentation before the committee arguing for Avandia's withdrawal, said that GlaxoSmithKline's letter did not mention that the committee had concluded that Avandia carried a higher risk of heart attack than Actos.

"Since the Tide trial compares these two alternative therapies, *this omission does not meet any reasonable ethical standards,*" Dr. Nissen said.

(emphasis added).

90. As information concerning the significant health risks associated with Avandia has been revealed the value of GSK stock has plummeted, including the value of the GSK stock held by Participants in their accounts in the Plans. The closing price of GSK stock on the NYSE on May 8, 2007, the first day of the Class Period, was $57.82. The closing price of GSK stock on August 19, 2010, the last day of the Class Period, was $37.29. The Defendants/fiduciaries should have "sounded the alarm" to alert Participants to diversify their retirement savings out of GSK stock. The Defendants/fiduciaries failed to do so, in violation of their fiduciary duties. Further, the Defendants/fiduciaries failed to take any action to protect the Plan and the Participants from the foreseeable substantial losses that would follow as the truth about Avandia emerged.

## MISMANAGEMENT OF THE PLANS' ASSETS

91. Pursuant to ERISA § 404(a), 29 U.S.C. § 1104(a), at all times relevant to this Complaint, Defendants had a duty to discharge their duties with respect to the Plans with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise

of a like character and of like aims, and to diversify investments in the Plans so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

92.     Defendants breached their fiduciary duties in that they should have known the facts alleged above and should have known that assets of the Plans should not have been invested in GSK stock during the Class Period.

## FIRST CLAIM: IMPRUDENT INVESTMENT OF PLAN ASSETS IN GSK STOCK (AGAINST ALL DEFENDANTS)

93.     Plaintiff realleges and incorporates herein by reference the allegations set forth above.

94.     Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plans any losses to the Plans resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

95.     Because of the practices described herein, the absence of internal quality controls and other means to assure that the Company's fundamental business operations complied in all respects with applicable rules and regulations, GSK common stock was not a prudent investment for the individual accounts under the Plans during the Class Period. Defendants knew or should have known that the above problems with Avandia would lead to potential recalls, significant litigation and damages, regulatory problems and reputational damages, resulting in a decrease in the value of the Fund.

96.     Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plans solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants. Defendants' selection, monitoring, and continuation of the investment alternatives under the Plans were subject to the above-described fiduciary duties. By

their continuing to offer GSK common stock as an investment under the Plan, when GSK's true adverse financial condition was being concealed, Defendants breached each of these fiduciary duties.

97.      As a consequence of Defendants' breaches, the Plans suffered losses.

98.      Defendants are individually liable to make good to the Plans any losses to the Plans resulting from each breach.

## SECOND CLAIM: NEGLIGENT MISREPRESENTATION AND NONDISCLOSURE (AGAINST ALL DEFENDANTS)

99.      Plaintiff realleges and incorporates herein by reference the allegations set forth above.

100.     Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plans any losses to the Plans resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

101.     Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plans solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.

102.     Defendants breached these fiduciaries in that they negligently made material misrepresentations and nondisclosures as alleged above.   Among other things, Defendants negligently misrepresented the facts that because of the foregoing facts concerning Avandia, the Company was at serious risk throughout the Class Period of civil suits and adverse FDA regulatory actions, including possibly product seizure, injunctions and civil penalties, and that the Company's reputation suffered significant harm because of the above.

103.    The Participants relied upon, and are presumed to have relied upon, Defendants' material misrepresentations and nondisclosures to their detriment.

104.    As a consequence of Defendants' material misrepresentations and misleading omissions, the Plans suffered losses.

105.    Defendants are individually liable to make good to the Plans any losses to the Plans resulting from each breach.

### THIRD CLAIM: DIVIDED LOYALTY
### (AGAINST ALL DEFENDANTS)

106.    Plaintiff realleges and incorporates herein by reference the allegations set forth above.

107.    Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plans any losses to the Plans resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

108.    Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plans solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.

109.    Defendants breached their fiduciary obligations when they acted in their own interests rather than solely in the interests of the Participants and Beneficiaries.

110.    As a consequence of these breaches, the Plans suffered losses.

111.    Defendants are individually liable to make good to the Plans any losses to the Plans resulting from each breach.

34

## FOURTH CLAIM: MISMANAGEMENT OF THE PLANS' ASSETS
## (AGAINST ALL DEFENDANTS)

112.    Plaintiff realleges and incorporates herein by reference the allegations set forth above.

113.    Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plans any losses to the Plans resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

114.    Pursuant to ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), the Defendants were required to discharge their duties with respect to the Plans solely in the interests of the Participants with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims, and to diversify investments in the Plans so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

115.    Defendants breached these duties in that the Plans invested in GSK stock when the price of GSK common stock was artificially inflated, and the Plans over allocated assets into GSK common stock, thereby failing to diversify assets so as to minimize the risk of large losses.

116.    As a consequence of these breaches, the Plans suffered losses.

117.    Defendants are individually liable to make good to the Plans any losses to the Plans resulting from each breach.

## FOURTH CLAIM:  BREACH OF THE DUTY TO PROPERLY APPOINT, MONITOR
## AND INFORM THE COMMITTEE AND MEMBERS OF THE COMMITTEE
## (AGAINST THE DIRECTOR DEFENDANTS ONLY)

118.    Plaintiff realleges and incorporates herein by reference the allegations set forth

above.

119.    The Director Defendants had the duty and responsibility to properly appoint, monitor and inform the members of the Committee and/or other persons who exercised day-to-day responsibility for the management and administration of the Plans and their assets.

120.    The Director Defendants failed to properly appoint, monitor and inform such persons in that the Director Defendants failed to adequately inform such persons about the true financial and operating condition of the Company or, alternatively, the Director Defendants did adequately inform such persons of the true financial and operating condition of the Company (including the financial and operating problems being experienced by GSK during the Class Period identified herein) but nonetheless continued to allow such persons to offer GSK common stock as an investment option under the Plans even though the market price of GSK common stock was artificially inflated and even though GSK common stock was not a prudent investment for Participants' retirement accounts under the Plans.

121.    As a consequence of these breaches, the Plans suffered losses.

122.    Director Defendants are individually liable to make good to the Plans any losses to the Plans resulting from each breach.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    Actual damages in the amount of any losses the Plans suffered, with such losses to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

B.    Costs pursuant to 29 U.S.C. § 1132(g); and

C.    Attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: August 26, 2010

STULL, STULL & BRODY

By:

Edwin J. Mills (EM-7117)
Michael J. Klein
6 East 45th Street
New York, NY 10017
Telephone: (212) 687-7230
Facsimile:  (212) 490-2022

*Attorneys for Plaintiff*

37